FRANKLIN *v.* KELLEY.

Franklin v. Kelley.

COUNTY CLERKS: *Power to take acknowledgments.* County clerks are authorized to take the acknowledgment of deeds conveying real estate.

FEDERAL AND STATE COURTS: *Their relative authority.* The United-States Supreme Court and the Supreme Court of this State are peers. The decisions of the former upon the Federal constitution and laws are binding on the latter: the decisions of the latter upon the constitution and laws of Nebraska are binding on the former. The decisions of neither upon questions of general jurisprudence are binding upon the other.

THE FEDERAL CIRCUIT AND STATE SUPREME COURTS: *Their relative authority.* The construction placed by the United-States Circuit Court upon a Federal statute is not binding upon the State Supreme Court. Its decision will be respectfully considered, but will not preclude an examination of its soundness.

PRE-EMPTIONS: *Conveyance before patent.* A conveyance by a party who has entered land under the United-States Pre-emption Law of Sept. 4, 1841, before the patent therefor has been issued to him, is not void.

*Argument* 1. In the construction of a statute, a universal practice by the people of long continuance under the act may be resorted to.

2. The terms of the act — "assignment and transfer" and "right" — are inapt to describe a deed of conveyance of the fee-simple.

3. Before his entry, the pre-emptor has only a "right" to the privilege which the statute confers; but after his entry, having paid for it, he has not a right, but ownership of it; so that his widow is endowable of it, and it is liable to taxation.

4. The mischief aimed at in the statute was the conveyance by the pre-emptor intermediate his entry and patent, whereby, if his

FRANKLIN *v.* KELLEY.

entry were erroneous, a *bona-fide* purchaser would be protected, and the government effectually injured. The clause means, that if, before the patent issues, the land department finds the entry erroneous, it may treat the assignment as void, and, notwithstanding it, set the entry aside.

5. The words " null and void," as in many statutes, so here, are used in the sense of " voidable."

6. Other congressional legislation supports the construction which we have placed on the act.

7. This construction of the statute is correct, because otherwise another clause would prohibit the same thing.

8. Congress could not impose such a restriction; for the United States holds the proprietorship of the public lands in States only as private persons do; and, the State having by statute provided that a grantor of land will be estopped to deny the title which his deed purports to convey, the United States cannot make a different rule. Per Mason, Ch. J.

EJECTMENT. FRAUD may be shown in an action of ejectment to avoid a deed.

——. Weakness of understanding alone is not sufficient to avoid a deed; but it is a material circumstance in establishing an inference of unfair practices and imposition.

——. *Only the party* defrauded can complain.

——. *Pleading.* The fraud need not be specially pleaded in order to admit proof of it.

Warren B. Franklin brought his action in the District Court for Washington County, under the provisions of the first chapter of title 18 of the Code of Civil Procedure, to recover from Timothy Kelley and Michael Kelley the possession of the west half of the north-west quarter and the south-east quarter of the north-west

FRANKLIN v. KELLEY.

quarter of section twenty, and the west half of the south-west quarter of section twenty-nine, in township seventeen, north of range thirteen, east of the sixth principal meridian.

By sect. 626 of that chapter it is provided, that, "in an action for the recovery of real property, it shall be sufficient if the plaintiff state in his petition that he has a legal estate therein, and is entitled to the possession thereof, describing the same as required by sect. 133; and that the defendant unlawfully keeps him out of the possession. It shall not be necessary to state how the plaintiff's estate or ownership is derived." And by sect. 627 it is provided, that " it shall be sufficient in such action if the defendant deny generally in his answer the title alleged in the petition, or that he withholds possession, as the case may be."

The pleadings were framed according to these provisions.

The action was tried before Crounse, J., and a jury; and the plaintiff introduced in evidence a deed to himself from Margaret Kelley, conveying the premises; which deed was, as his certificate thereto attached showed, acknowledged before " A. Castetter, county clerk of Washington County; " the defendants objecting, because, as he insisted, said county clerk was not competent to take acknowledgment of deeds. The plaintiff also introduced in evidence a deed from the defendant, Timothy, to the said Margaret, conveying to her the premises in question; also a deed to said Timothy, from Michael Williams, of the west half of the south-west quarter of section twenty-nine; also the record of a certificate of the Register of the United-States Land Office, showing the entry by said Williams under the provisions of the Act of Congress of Sept. 4, 1841, granting pre-emption rights of the premises so by him

conveyed to said Kelley; also a like certificate of entry
by said Kelley of the remaining portion of the dis-
puted lands. Thereupon the plaintiff rested.

The defendants then called A. Castetter, who testified
as follows: "I know of the making of a deed from
Margaret Kelley to Warren B. Franklin. I was living
at De Soto at the time. I was county clerk of Wash-
ington County. I took the acknowledgment of this
deed at my house. The plaintiff and his wife, and Mar-
garet Kelley and my wife, were present. I think I had
seen Mrs. Franklin once or twice before. I had never
seen Margaret Kelley. The plaintiff and his wife
brought Margaret there in a wagon. Franklin was
living in a small house beside the road, below Calhoun,
at the time. It was a blustering day : it was sharp, but
not extremely cold. They all came in together. Frank-
lin opened to me the business there." The witness was
then interrogated as follows: "State all the circum-
stances attending the signing, acknowledging, and de-
livery of the deed from Margaret Kelley to Warren B.
Franklin, dated Jan. 6, 1866." And thereupon the coun-
sel for said defendants stated to the Court, that the
object of the question, and the evidence to be thereby
elicited, was to show that the said deed was obtained
by undue influence, duress, and fraud; and that at the
time said Margaret Kelley had very feeble mental ca-
pacity, and that the said plaintiff, in obtaining said deed,
fraudulently took advantage thereof; and also offered
in evidence a deed from said Margaret to said Timothy,
reconveying said premises to him, dated Jan. 13, 1866.
The plaintiff objecting, the Court refused to permit the
witness to answer the question, or to admit the last-men-
tioned deed in evidence ; and the defendants excepted.

The defendants also offered to show that the patents
from the United States were not issued until after the

making of the said deeds: but, the plaintiff objecting, the Court refused to hear the proof; and the defendant excepted. The jury found for the plaintiff. The defendants moved for a new trial, which was refused, and judgment was entered on the verdict. The defendants brought the case to this Court by petition in error.

*A. J. Poppleton* and *J. M. Woolworth*, for plaintiff in error.

I. The deed from Margaret Kelley to the plaintiff Franklin was not acknowledged before an officer authorized to take acknowledgment of deeds. The county clerk is not clerk of such a Court as is referred to in the Recording Act.

II. The evidence which the defendant offered of undue influence exerted by the plaintiff in obtaining the deed from Margaret Kelley, amounting to fraud, would have overthrown the deed, and should have been admitted. Evidence of a like character has been admitted in the following cases: *Lessee of Torrey* v. *Beardsley*, 4 *Wash. C. C.*, 242; *Den* v. *Moore*, 2 *Southard*, 470; *Marcy* v. *Kinney*, 9 *Conn.*, 394; *Giddings* v. *Canfield*, 4 *Id.*, 482; *Jackson* v. *Myers*, 11 *Wend.*, 533; *Lessee of McCall* v. *Carpenter*, 18 *How.*, 297; *Bruce* v. *Lee*, 4 *Johns.*, 410; *Parker* v. *Barker*, 2 *Met.*, 423; *Fay* v. *Winchester*, 4 *Id.*, 513; *Stow* v. *Russell*, 36 *Ill.*, 18; *Small* v. *Jones*, 6 *Watts & S.*, 122; *McCaskey* v. *Graff*, 23 *Penn. St.* (11 *Harris*), 321.

III. The deed from Timothy to Margaret Kelley was void, because made by a pre-emptor, under the Act of 1841, before the issuing of the patent. *Kellom* v. *Easley*, *Dillon's C. C.*, 281.

*E. Wakeley*, for defendant in error.

MASON, Ch. J.

On the trial in the Court below, the defendants objected to the deed offered by the plaintiff, made by Margaret Kelley to the plaintiff, on the ground that it was not acknowledged before an officer competent to take acknowledgments of deeds. The instrument had attached thereto a certificate of acknowledgment, made by "A. Castetter, county clerk of Washington County;" and the question is, whether that officer is competent to take acknowledgments. That power is conferred upon him by sect. 43, on page 44 of the Revised Statutes. The Court was right in overruling the objection.

The defendants, in order to avoid the several deeds by which the plaintiff had made out his title, offered to show that the patents for the land were not issued until after the deeds were made. The theory upon which this position rests is, that as the lands were originally secured from the government by pre-emption, under the Act of 1841 (which fact the plaintiff showed in the course of his direct proofs), the deeds of the pre-emptors, made before the issue of the patent, were, by virtue of a provision of said act, void. The counsel for the defendants have been content to cite, in support of this position, the recent decision of Judge Dillon in the United-States Circuit Court for the District of Nebraska, in the case of *Easley et al.* v. *Kellom et al.*, *Dillon's Circuit-Court Reports*, 281; and they insist that we in this Court are bound to accept that decision as an authoritative exposition of the law.

In these days of Federal absorption and State subserviency, this idea is likely to receive a too ready assent. But a moment's reflection will expose its error. The United-States Circuit Courts are, with the exception of a limited appellate jurisdiction, vested with original ju-

FRANKLIN *v.* KELLEY.

risdiction ; and appeals lie from their judgments to the Supreme Court. Consequently their decisions, even upon the construction of Federal statutes, are not final or conclusive. Different statutory constructions have in many cases been given by different circuit judges to the same statute. In the case cited, an illustration is furnished. The cause was first heard and determined by Judge Love, and a decree rendered by him for the plaintiffs. It was afterwards heard upon a bill of review by Judge Dillon, who reversed Judge Love's decree, and dismissed the plaintiffs' bill. The judgments of courts which vacillate in this way are not entitled to very much consideration from other tribunals. And, further than this, it is to be observed, that the Circuit Courts are, in respect of causes between citizens, co-ordinate with our District Courts, and not with this Court. The peer of this Court is the Supreme Court of the United States. Its decisions upon questions arising out of the Federal constitution and Federal statutes are binding on us; but so, on the other hand, our decisions upon questions arising out of our State constitution and our State statutes are binding upon it. At the same time, upon that wide domain which is presented by general jurisprudence the Federal Supreme Court and the State Supreme Court hold an equal and divided jurisdiction. Our opinions are not binding upon it, nor its opinions upon us. Subordinate to it is the Circuit Court of the United States; subordinate to us is the District Court of this State. It is manifestly absurd to claim for its subordinate tribunals any binding authority on us.

At the same time, we shall always yield to the judges who sit in the United-States Circuit Court the respect to which, by their learning and their talents, they have proved themselves entitled. Especially shall we give to their opinions upon Federal statutes the utmost attention :

we shall accept them whenever we do not feel constrained to reject them. But, reserving to ourselves the full right to consider the grounds upon which they are based, and governing ourselves by the duty which devolves upon us of exercising our own judgments, we shall decline to follow them when they appear to us manifestly unsound; and, as we cannot accept the construction of this Federal statute which the Circuit Court in the case cited adopted, we deem it right to set forth our reasons with considerable fulness and detail. Our duty in every point of view renders this course imperative.

We are met at the outset by the consideration, that the construction of this statute contended for by the defendants, and given by the Federal Court, is novel. The statute was passed in 1841, — thirty years ago. The pioneers in all the States settled during that long period have acquired titles to their lands under it; and a very large proportion of all the lands in the new States to-day is held by pre-emption entries. The practice during all this period has been for the pre-emptor to sell and convey the land after making his entry, and before receiving his patent. Always and everywhere, his deed intermediate his entry and his patent has been held and treated and deemed to be as valid and perfect as that of a person who has received his patent; and almost all the land that, since the enactment of the law, has been entered under it, is held by deeds made before the issue of the patent. The mischief which will be done by upsetting a universally-received opinion upon such a subject is too obvious to need to be pointed out.

But we do not place our opinion upon the ground of such mischief. There is no evil greater than judicial legislation; and no other apprehended evil will justify it. We wish here distinctly to direct attention, not to the mischief likely to follow the construction for which

Franklin *v.* Kelley.

the defendant contends, but to the fact that that construction is novel, and conflicts with a universal practice which has prevailed among the people ever since the law was passed. We are authorized to resort to this common practice to ascertain the meaning of this provision.

Chief Justice Vaughn, in *Sheppard* v. *Gosnold, Vaughn's Reports,* 165, cited in 1 Kent's Commentaries, says, that, when the penning of a statute is dubious, long usage is a just medium to expound it by; for *jus ad norma loquendi* are governed by usage. The meaning of things spoken or written must be, as it hath been constantly received to be, taken from common acceptation." This principle has been applied in several cases. In *Stuart* v. *Laird,* 1 *Cranch,* 299, a trial was had in the Circuit Court of the United States, at which Chief Justice Marshall of the Supreme Court presided. Objection was made, that the judges of the Supreme Court were not judges of the Circuit Courts, without a special appointment thereto, and a distinct commission as such. The Court says on the objection, " To this objection, which is of recent date, it is sufficient to observe, that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has, indeed, fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong to be shaken or controlled. Of course the question is at rest, and ought not to be disturbed."

In *McKean* v. *Delancy's Lessees,* 5 *Cranch,* 22, the question arose under an act of Pennsylvania, passed in 1715, which required deeds to be acknowledged before a justice of the peace of the county where the land lay; and it had been the long-established practice, before 1775, to acknowledge deeds before a judge of the Su-

preme Court. The Court says, that a judge of the Supreme Court could not be considered as a justice of the peace of the county; and, were the act to be for the first time construed, the decision would be, that the deed was not properly acknowledged: yet, as the practice had long prevailed, it was held that it must be a correct exposition of the statutes; that long and uninterrupted practice under a statute was good evidence of such construction. See also *Martin* v. *Hunter*, 1 *Wheaton*, 304; *Cohens* v. *Virginia*, 6 *Wheaton*, 264; *Myrick* v. *Hasey*, 27 *Maine*, 9; *Whitcomb* v. *Reed*, 20 *Vermont*, 49.

Upon the principle of construing statutes by a long-continued and generally-received practice, we are justified in holding, that the deeds in question, made by pre-emptors before they had received their patents, were valid.; but we do not place our decision solely on this ground. An examination of the statute and its terms will show that this construction is commended to us, not only by its general reception extending through so many years, but also by its own soundness. The clause which is supposed to support the opposite construction is as follows: —

"All assignments and transfers of the right hereby secured prior to the issuing of the patent shall be null and void." 5 *United-States Statutes at Large*, page 456, sect. 12.

There is a manifest inaptness in this language to describe a conveyance with covenants for title and with warranty, purporting to pass the fee-simple of lands and tenements. I know no other place, in law-books or law-writings, where such a conveyance is spoken of as an assignment or a transfer. Those words may have the large meaning here sought to be placed upon them; but it is very unusual. These terms are used more usually — indeed always, so far as I remember — when applied

FRANKLIN *v.* KELLEY.

technically to describe a transfer of an estate for years, or an equitable interest, or a chattel; and this seems to be the use of it here when taken in connection with the word " right," — a word never employed when speaking of a fee in lands, or even an estate less than a fee in lands. It is evident that these pre-emptors did not profess to convey by their deeds a mere " right: " the instruments purport on their face to pass the absolute ownership of the lands, — the fee-simple. And the rule of statutory construction is, that, when technical words occur in a statute, they are to be taken in a technical sense. 1 *Kent's Com.*, 462; *Clarke* v. *The City of Utica*, 18 *Barb.*, 451; *Merchants' Bank* v. *Cook*, 4 *Pick.*, 405; *Regina* v. *Commissioners of Poor Laws Holborn Union*, 6 *Adol. & Ellis*, 68, 69; *Vattel*, book ii., chap. xvii., page 285.

This conducts us to a consideration of the interest which the pre-emptor has in the lands after he has entered them, and before the patent therefor has issued to him. Has he, during that period, a mere right thereto? or is he the absolute owner thereof by virtue of an indefeasible title? It is evident, that, if he have but a " right " thereto, the language of the provision is apt; but if he has an indefeasible estate, then it is not apt, and hence a strong argument may be drawn against the effect claimed by the defendant.

The tenth section of the act provides, that a person having certain qualifications, who has settled upon and improved a quarter-section of land, may enter the same with the register, paying the minimum price therefor fixed by Congress. Sect. 14 provides in substance that this privilege shall continue until the public sales, and no longer. The benefit which the act confers is simply this: it authorizes an actual settler to enter at a certain price the land on which he resides until the government

offers the tract for sale to the public. This privilege is secured to the claimant by settlement and improvement. When he does what is required by law to secure to himself the privilege of entering the tract, he becomes entitled to make the entry in preference to any other party. His right consists in just that: his right is to purchase before others at a stipulated sum. His relation to the government is precisely the same as that of a vendee to a vendor in a contract. His agreement is to improve the land, and reside on it, and pay for it within a certain time : that of the government is to convey the land to him when he has performed his undertakings. Until he does make payment for the land, he has a "right" merely to execute on his part, and to have the government execute on its part, this mutual agreement. All he has is a mere "right." But when he does make payment for the land, and receives a patent certificate evidencing the fact, he has more than a right: he has the land itself. He exercises his pre-emption right when he makes the purchase.

The phrase "pre-emption right" of itself pretty clearly expresses this idea, and nothing more ; and, wherever it is used in the statute, that seems to be its signification. In that sense it is used in all the cases. It is unnecessary to refer to the several passages in the opinions ,to point this out minutely. See *Wilcox* v. *McConnel*, 13 *Peters*, 498 ; *Barnard* v. *Ashley*, 18 *Howard*, 43 ; *Lytle* v. *Arkansas*, 9 *Howard*, 314; *Clements* v. *Warner*, 24 *Howard*, 394 ; *Opinions Attorneys-General*, 493, 494 ; *id.*, 23.

After the entry is made, the pre-emptor becomes seized of the lands. Before the entry, the widow has no dower (*Davenport* v. *Farrar*, 1 *Scammon*, 314) : after it, there is an estate of which she is endowed.

Before the entry, the lands are not subject to taxation:

FRANKLIN v. KELLEY.

thereafter they are subject to taxation. *Carroll* v. *Safford*, 3 *Howard*, 441. In this case language pertinent to our present inquiry is used. Mr. Justice McLean, delivering the opinion of the Court, says, at page 460, —

" When the land was purchased and paid for, it was no longer the property of the United States, but of the purchaser. He held for it a final certificate, which could no more be cancelled than a patent. It is true, if the land had been previously sold by the United States, or reserved from sale, the certificate or patent might be recalled by the United States, as having been issued through mistake. In this respect there is no difference between the certificate-holder and the patentee.

" It is said the fee is not in the purchaser, but in the United States, until the patent shall be issued. This is so technically at law, but not in equity. The land in the hands of the purchaser is real estate, descends to his heirs, and does not go to his executors or administrators. In every legal and equitable aspect, it is considered as belonging to the realty. Now, why cannot such property be taxed by its proper denomination as real estate ? — in the words of the statute, ' as lands owned by non-residents ' ? And, if the name of the owner could not be ascertained, the tract was required to be described by its boundaries or any particular name. We can entertain no doubt that the construction given to this act by the authorities of Michigan, in regard to the taxation of land sold by the United States, whether patented or not, carried out the intention of the law-making power.

" But it is insisted that the lands in question were not, before the date and execution of the patents for them, subject to taxation at all by the State of Michigan.

" It is supposed that taxation of such lands is an

interference with the primary disposition of the soil by Congress, in violation of the Ordinance of 1787; and that it is a tax on the lands of the United States, which is inhibited by the ordinance. Now, lands which have been sold by the United States can in no sense be called the property of the United States. They are no more the property of the United States than lands patented. So far as the rights of the purchaser are considered, they are protected under the patent certificate as fully as under the patent. Suppose the officers of the government had sold a tract of land, received the purchase-money, and issued a patent certificate: can it be contended that they could sell it again, and convey a good title? They could no more do this than they could sell land a second time which had been previously patented. When sold, the government, until the patent shall issue, holds the mere legal title for the land in trust for the purchaser; and any second purchaser would take the land charged with the trust."

And, until the entry is actually made, no interest is vested in the pre-emptor. It is competent for Congress to deprive a party, who has settled upon the land, of the benefit granted by the act. This precise question was presented in *Frisbie* v. *Whitney*, 9 *Wallace*, 187. Mr. Justice Miller, delivering the opinion of the Court in that case, discusses it as a case in which a party went upon lands subject to pre-emption, and had done what the act required, but from whom thereafter Congress withdrew the benefit. The learned judge says, " What had he (the pre-emption claimant) done? He had gone upon the land, built a house and barn, and perhaps enclosed some of the ground. He also applied to the register of the land office, and offered to make a declaration that he had done these things with

FRANKLIN *v.* KELLEY.

the intention of making a permanent settlement, and claiming the land under the right of pre-emption. This is all. He had paid no money, nor had he then tendered any. The land officers refused to receive his declaration, and denied his right to pre-empt the land. He never has paid any money, has never received any certificate of pre-emption, and the register and receiver have never in any manner acknowledged or admitted his right to make pre-emption of that land. So far as any thing done by him is to be considered, his claim rests solely upon his going upon the land, and building and residing on it. There is nothing in the essential nature of these acts to confer a vested right, or indeed any kind of claim to land ; and it is necessary to resort to the pre-emption law to make out any shadow of such right.

" The act of Congress on this subject, to which all the subsequent acts refer, and which prescribes the terms and the manner of securing title in such cases, is the Act of Sept. 4, 1841. That was an act full of generosity ; for it gave the proceeds of the sales of all the public lands to the States. The tenth section of the act provides, that any of the class therein described who shall make a settlement upon public lands of a defined character, and who shall inhabit and improve the same, and who shall erect a dwelling thereon, shall be authorized to enter with the register of the proper land office, by legal subdivisions, one quarter-section of said land, to include the residence of the claimant, upon paying the minimum price of such land. Sect. 11 provides that conflicting claims for pre-emption shall be settled by the register and receiver ; sect. 12, that, prior to such entry, proof of the settlement and improvement required shall be made to the satisfaction of the register and receiver ; and sect.

FRANKLIN *v.* KELLEY.

13 requires an oath to be made by the claimant before entry. Sect. 15 requires a person settling on land with a view to pre-emption to file, within a limited time, a statement of this intention, and a description of the land.

" When all these prerequisites are complied with, and the claimant has paid the price of the land, he is entitled to a certificate of entry from the register and receiver; and after a reasonable time to enable the land officer to ascertain if there are superior claims, and if, in other respects, the claimant has made out his case, he is entitled to receive a patent, which, for the first time, invests him with the legal title to the land.

" The construction of this act, and others passed since, *in pari materiâ*, in regard to the nature of the rights conferred on occupants of the public lands, has, of course, received the consideration of that department of the government to which the administration of these land laws has been confided. The construction of that department, and of the Attorneys-General to whom the Secretaries of the Interior have applied for advice, cannot be better expressed than in the language of some of those opinions.

" Attorney-General Cushing, in an opinion given in 1856, says, ' Persons who go upon the public land with a view to cultivate now, and to purchase hereafter, possess no right against the United States, except such as the acts of Congress confer; and these acts do not confer on the pre-emptor *in posse* any right or claim to be treated as the present proprietor of the land in relation to the government.'

" In the matter of the Hot-Springs tract of Arkansas, Attorney-General Bates says, ' A mere entry upon land, with continued occupancy and improvement thereof, gives no vested interest in it. It may, how-

ever, give, under our national land system, a privilege of pre-emption ; but this is only a privilege conferred on the settler to purchase land in preference to others. His settlement protects him from intrusion or purchase by others, but confers no right against the government.'

" In the matter of this same Soscol Ranch, Attorney-General Speed asserts the same principle : he says, ' It is not to be doubted that settlement on the public lands of the United States, no matter how long continued, confers no right against the government. The land continues subject to the absolute disposing power of Congress until the settler has made the required proof of settlement and improvement, and has paid the requisite purchase-money.' "

These opinions, written for the guidance of the land department, have been received and acquiesced in by the Secretaries of the Interior, and have come to be the recognized rule of action in that department.

This construction of the law has also been asserted by the courts of last resort in Missouri, Mississippi, Illinois, and California, — States in which the population is largely interested in the liberal operation of the pre-emption laws.

We are satisfied that this is a sound construction of the pre-emption laws on the question now under consideration.

And it is only upon this view — that, prior to the entry by the pre-emptor of lands claimed by him, no interest is vested in him, but that thereafter he holds a title indefeasible, either by the government or any third party — that a great multitude of cases can be supported.

There is the large class of cases in which it has been held, that, after the pre-emptor has made his entry, the

government cannot grant the land to another; and, if its officers attempt to do so, the act is void. *Stoddard* v. *Chambers*, 2 *Howard*, 284; *Bissell* v. *Penrose*, 8 *id.*, 317; *Cunningham* v. *Ashley*, 14 *id.*, 377.

Then, again, there is the very large and severely-contested class of cases, in which the courts, refusing to be concluded by the action of the land department in issuing a patent to one of two contesting pre-emptors, has inquired who had the prior right, and awarded the lands to him, and directed the patentee to convey accordingly. The cases of *Smiley* v. *Sampson*, and *Towsley* v. *Johnson*, 1 *Nebraska*, 56, recently affirmed in the United-States Supreme Court, are instances.

Both of these classes of cases proceed solely upon the idea, that an interest in the land, not subsisting in mere right, but absolute and indefeasible in its nature, and needing nothing to perfect, establish, or confirm it, is possessed by the pre-emptor after his entry.

So far the question is simple, and easy of solution. But the clause under consideration contains other words which demand our notice. It provides that the right secured by the act shall not be assigned "before the patent issues." It is these words which present the difficulty: for it is said that it is a matter of indifference by what form of instrument the interest secured by the act is transferred; that the prohibition is general and absolute until the patent actually issues.

The position is plausible; but its unsoundness becomes apparent as soon as the whole case is fairly considered.

It is a familiar canon of statutory construction, that every word, phrase, and clause shall have its full and legitimate force in determining the meaning of the lawgiver. In fact, it is by virtue of this rule that our attention to the limiting words here — "before the issuing of the patent" — is challenged. Now, we have seen what

is meant by the words "right hereby secured." To that meaning we must adhere ; and the question then is, What is meant by the provision, that the right to enter at the minimum price, in preference to all others, a certain tract, shall not be assigned before the patent is issued? We are bound to adopt such a construction as avoids the apparent contradiction, if a reasonable one can be discovered. We think that one is at hand.

The Act of 1841 provides that the entry shall be made with the register of the land office. The acts organizing the land department of the government provide that the action of the register shall be subject to revision and supervision by the commissioner of the general land office ; and entry with the register is dependent upon the approval of his superior, so far as the course and order of the business goes ; and, without the affirmative action of the commissioner, the patent issues. It would be a great evil if a party, claiming a pre-emption right, could, as soon as his entry was made, convey the land to a third party, and thereby prevent the commissioner from re-examining and disapproving the entry if it was erroneously allowed. Such a course would expose the government to serious loss, and pervert a statute conceived in a wise policy and a generous spirit into a means of perpetrating the greatest frauds. This is the mischief aimed at. The object was to protect the government ; and in this view the language — that the right secured by the act should not be assigned — is apt. As between the claimant and the government, his interest is a right merely until the patent issues. It is subject to re-investigation, and, on inquiry, to be disregarded by the department. Until the patent issues, it is treated by the government, not as a title, but as a right, or a claim of right.

I admit, that if an entry under the act is made with

FRANKLIN *v.* KELLEY.

the register, and the commissioner finds that it was illegally allowed, — as, for instance, if the entry is upon lands not subject to pre-emption, — and he sets it aside, a conveyance intermediate the entry and the official act of vacating it would be void. Such a conveyance would be within the mischief. But if a valid entry be made, and a patent issued upon it, a conveyance intermediate those two acts would not be within the mischief. The issue of the patent is a confirmation of the entry : it relates back to it, and takes effect from it. *Astrom* v. *Hammond*, 3 *McLean*, 107.

In such a case, the government is not defrauded in supporting the conveyance.

Nor is it any objection to this construction that the assignment is declared to be null and void. Viner, title Void and Voidable, A., pl. 18, says that a thing may be void in several degrees : 1. Void, so as if never done, to all purposes, so as all persons may take advantage thereof. 2. Void to some purposes only. 3. So void by operation of law, that he that will have the benefit of it may make it good : of which last class manifestly is this case ; for, beyond all doubt, these pre-emptors could confirm the deeds here in question. Those words are in many statutes used in the sense of voidable.

In *Prigg* v. *Adams*, 2 *Salkeld*, 674, the defendant justified as an officer under a *ca. sa.*, on a judgment in the Common Pleas, upon a verdict of five shillings for a cause of action arising in Bristol. The plaintiff replied the private act of Parliament for erecting the Court of Conscience in Bristol, wherein was a clause, that if any person bring such action in any of the courts at Westminster, .and it appeared upon trial to be under forty shillings, no judgment should be entered for the plaintiff ; and, if it be entered, that it should be *void*. Upon demurrer, the question was, whether it was so

FRANKLIN *v.* KELLEY.

far void that the party could take advantage of it in a collateral action; and the Court held that it was not, but that it was only voidable by plea or error.

In *Anderson* v. *Roberts*, 18 *Johnson*, 515, where the question was, whether a deed to defraud creditors was void or voidable, Judge Spencer, delivering the opinion of the Court, says, "In my judgment, the error of those who assert that a fraudulent grantee under the 13th Elizabeth takes no estate, because the deed is declared to be *utterly void*, consists in not correctly discriminating between a deed which is an absolute nullity and one which is voidable only. No deed can be pronounced, in a legal sense, utterly void, which is valid as to some persons, but may be avoided at the election of others. In 2 Lilly's Abr. 807, and Bac. Abr., title Void and Voidable, we have the true distinction. A thing is void which is done against law at the very time of doing it, and where no person is bound by the act; but a thing is voidable which is done by a person who ought not to have done it, but who, nevertheless, cannot avoid it himself after it is done. *Bacon* classes under the head of acts which are absolutely void to all purposes the bond of a *feme covert*, an *infant*, and a person *non compos mentis*, after an office found, and bonds given for the performance of illegal acts. He considers a fraudulent gift void as to some persons only, and says it is good as to the donor, and void as to creditors. Whenever the act done takes effect as to some purposes, and is void as to persons who have an interest in impeaching it, the act is not a nullity, and therefore, in a legal sense, is not utterly void, but merely voidable."

I concede that this case does not dispose of the question before us, except as we assume as proved what has been laid down above, — that the mischief aimed at was the defrauding of the government by an effectual con-

veyance to a third party of lands entered with the register, but found to be erroneously entered by the commissioner; and that the instrument is void as to the government only. But the last citation shows very clearly the consequence of deeming the provision applicable only to the government. I think that it is clear that the provision should be thus limited.

*Hone* v. *Woolsey*, 2 *Edwards's Ch. R.*, 287, was a bill by judgment creditors to avoid an assignment for the benefit of creditors. An instrument of that character had been made ; but the Court, having in another case decided that a provision therein made it void, the trustees reconveyed the property, and the debtors executed the instrument in question, again assigning upon like trusts the same property to the same trustees. The Vice-Chancellor says, —

" Again, a void deed is incapable of confirmation or of being made good by any subsequent act of the party ; while one which is merely voidable may be made good by matter *ex post facto*. It may be confirmed, and will then be effectual for all purposes, unless the rights of third persons intervene and prevent it. Nothing, I consider, is more clearly settled than that an assignment constructively fraudulent under the statute, or at common law in regard to creditors, is voidable only, and not absolutely void. I had occasion to examine this doctrine in the recent case of *Henriques* v. *Hone, ante*, page 120 ; and the principles there stated, adduced from former decisions, I must adhere to until I shall be better instructed by the final decision to be had on the appeal in that cause.

" In the case I am now considering, the first assignment, of the third day of July, one thousand eight hundred and thirty-two, was not a nullity. It was voidable only as between the assignors and assignees : the title

passed, and a trust was created for creditors upon the trusts and conditions contained in it. None of the creditors came forward to accept the property upon those terms; and it appears to me, that before the rights of any of the creditors had actually attached as *cestuis que trust* under the assignment, and before any of them were in a situation to acquire liens by virtue of judgments and executions returned and the filing of bills, the parties were at liberty to do any further acts by which the assigned property might be held by the assignees upon similar trusts, but divested of the objectionable features of the first instrument. If the assignment were capable of confirmation, then no matter in what form it may have been done, — whether by a conveyance back to the assignors and a reassignment by them, or by an instrument reiterating the trusts, and dispensing with the conditions upon which they were to take effect. This Court will look to the object and intent of the parties, and give effect to their acts so as to carry such into effect wherever it is fair and honest."

*Young* v. *Billiter*, 9 *House of Lords Cases*, 682, was an action of trover for goods brought by Billiter as assignee of Flint. The defendant, among other pleas, pleaded, that, before Flint became insolvent, the defendant recovered judgment against him, and took his goods in execution; and that such taking, and the sale thereof, were the conversion complained of. The replication alleged, that Flint, being in insolvent circumstances, did, with intent of petitioning the Court for the relief of insolvent debtors, voluntarily and fraudulently, and contrary to the statute, charge his estate in favor of Young, then being a creditor, by means of a warrant of attorney fraudulent and void within the statute, whereby Young obtained the judgment and execution by him pleaded.

FRANKLIN v. KELLEY.

The provision of the statute was as follows : —

" If any prisoner shall, before or after his imprisonment, being in insolvent circumstances, voluntarily convey, assign, transfer, charge, deliver, or make over, any estate, real or personal, security for money, bond, bill, note, property, goods, or effects whatsoever, to any creditor, or to any person in trust for, or to or for the use, &c., of any creditor, every such conveyance, assignment, transfer, charge, delivery, and making over, shall be deemed, and is hereby declared to be, fraudulent and void as against the provisional or other assignee or assignees of such prisoner appointed under this act ; *provided* that no such conveyance, assignment, transfer, charge, delivery, or making over, shall be so deemed fraudulent and void, unless made within three months before the commencement of such imprisonment, or with the view or intention, by the party so conveying, assigning, transferring, charging, delivering, or making over, of petitioning the said Court for his discharge from custody under this act."

The lords took the opinion of the judges upon the question; and Mr. Justice Blackburn states his views thus: " I think that the better construction of the statute is, that the transaction is valid till the assignees indicate an intention to treat it as void ; and that, consequently, the act of seizing or selling the goods under the authority of the transfer whilst yet valid cannot be treated as being a wrongful conversion." And this is the view taken by the lords, who severally delivered their judgments.

*Bryan* v. *Childs*, 5 *Exch.*, 368, brought up for construction the words " null and void to all intents and purposes whatever," contained in 12 and 13 Victoria, chap. cvi., sect. 137, as follows : —

" Every judge's order made by consent by a trader

FRANKLIN *v.* KELLEY.

defendant in a personal action, and whereby the plaintiff is authorized forthwith, after the making of the order or at any future time, to sign or enter up judgment, or to issue or take out execution, and whether the order is made subject to a defeasance or condition or not, — in case the action in which the order is made is in the Court of Queen's Bench, or in any other court, a true copy of the order shall, together with an affidavit of the time of consent being given, and a description of the residence and occupation of the defendant, be filed with the officer acting as clerk of the dockets and judgments in the Queen's Bench within twenty-one days after the making of the order, in like manner as warrants of attorney, and cognovits or copies thereof, and affidavits of the execution thereof, may be filed ; otherwise the judge's order and judgment signed or entered up thereon, and execution issued and taken out on the judgment, shall be null and void to all intents and purposes whatever." And it was held that these words were, by force of the general intent of the statute, applicable only to the trader afterwards becoming bankrupt, and not to his assignee.

*Nash* v. *Birch*, 1 *M. & W.*, 402, was an action upon an agreement of demise, containing a proviso, that, if the tenant did not within a time limited erect a shopfront, the lease should be null and void ; and it was held to be voidable at the option of the lessor. The same was held of like terms, in a lease stipulating for nonpayment of rent, in *Rede* v. *Farr*, 9 *M. & S.*, 121. See also *Hughes* v. *Palmer*, 19 *C. B.* (*N. S.*), 393.

It is clear from these cases, which might be greatly multiplied, that the use of the words " null and void " does not preclude the construction which we have put upon the provision.

I think Congress has placed a construction on this

FRANKLIN *v.* KELLEY.

clause which the courts are bound to observe. The Act of May 30, 1830, chap. ccviii., contains a provision precisely like that here under consideration. On the 23d of January, 1830, Congress passed a law providing that all persons who had purchased under the first-mentioned act might " assign and transfer their certificates of purchase or final receipts, and patents might issue in the name of such assignee."

I think this clause indicates pretty clearly that Congress understood the inhibition as relating to transfers by which the government would be bound, so as to compel it to issue patents to the assignee ; and also that the assignment prohibited was not a conveyance of the land, but a transfer of the right as heretofore defined.

The rule is well settled, that, when a legislature re-enacts a statute upon which a construction has been placed, it does so with the construction annexed. *Henry* v. *Tilson*, 170 *C. & M.*, 479, and *Rex* v. *Loxdale*, 1 *Burr.*, 44 ; *Theriat* v. *Hart*, 2 *Hill*, 380 ; *Goodell* v. *Jackson*, 20 *Johnson*, 772 ; *Young* v. *Dake*, 1 *Seld.*, 463.

We have thus far considered the case with reference to the single clause above mentioned ; but there is another provision of the statute which demands our attention. I refer to the latter part of the thirteenth section, which is as follows: " And, if any person taking such oath shall swear falsely in the premises, he or she shall be subject to all the pains and penalties of perjury, and shall forfeit the money which he or she may have paid for said land, and all right and title to the same ; and any grant or conveyance which he or she may have made, except in the hands of *bona-fide* purchasers for a valuable consideration, shall be null and void. And it shall be the duty of the officer administering such oath to file a certificate thereof in the public land office of such district, and to transmit a duplicate copy to the

general land office, either of which shall be good and sufficient evidence that such oath was administered according to law."

It will be observed that the terms here used are apt to describe such an instrument as is here presented. If the clause in sect. 12 has the construction contended for, it presents the very case covered by the clause in the thirteenth section. This will be easily illustrated. The construction contended for would make the first clause read thus: "A conveyance of the land by a pre-emptor, after he has purchased and paid for it, and before he has received his patent, shall be void." The second reads thus: "If a party, when he makes his entry, swears falsely in taking the oath prescribed, a deed made by him shall be void." The deed avoided in the latter case may be made at any time after the entry, and is avoided except as to a *bona-fide* purchaser whose rights are saved. The construction sought to be placed on the former clause avoids a deed made during the same period, and does not even save the rights of purchasers. It is much more reasonable to hold, that the prohibition, if to be held to extend to third parties, relates to assignments of the right to pre-empt, which obviously should extend to all persons, and make each clause apply to a separate and distinct subject. This is required by the familiar rule, that such a construction is to be placed upon an act as will give effect to each and every part, clause, and phrase thereof. *Commonwealth* v. *Duane*, 1 *Binney*, 601; *Commonwealth* v. *Alger*, 7 *Cushing*, 53; *Attorney-General* v. *Detroit, &c., Co.*, 2 *Michigan*, 138.

The views here expressed are supported in many cases adjudged in the State courts. I shall content myself here with mentioning two in which very satisfactory opinions were delivered. The first is *Dilling-*

*ham* v. *Fisher*, 5 *Wisconsin*, 475. This was ejectment. It appeared by stipulation that Crane pre-empted the premises under the Act of 1838, which contained the same provision as the Act of 1841, making his entry, and paying for the land, and receiving his certificate on the sixteenth day of November, 1838; and the patent did not issue until the ninth day of May, 1842. On the 22d of January, 1855, Crane conveyed to Cooper, under whom the plaintiff derived title.

The defendant showed title to the premises by divers deeds from one Kearney, to whom Crane conveyed after his entry, and before the issuance of the patent; and the case is made to turn upon the validity of that deed.

Whiton, Ch. J., delivering the opinion of the Court, says, —

" The authorities being thus at variance, we shall be compelled to view the question somewhat as an original one. What, then, is the proper construction to be put upon this provision? It was stated at the argument, that although the terms ' right of pre-emption,' or ' pre-emption right,' as used in the Act of Congress, are somewhat ambiguous, the words ' before the issuance of the patent ' show clearly that it was the intention of Congress to prohibit sales of the land after pre-emption has been obtained, as well as the right which the pre-emptor has before the payment of his money and the issuing of the certificate. It was insisted that these words made the meaning of the statute plain, which, without them, would be ambiguous.

" But we think that these .words create the only ambiguity which this part of the statute presents. If the term ' right of pre-emption ' only had been used, we should not have had any difficulty in giving the statute a construction, as these words have acquired, in that

part of the United States where the public lands are situated, a clear and definite signification. They mean the exclusive right which a person has to purchase a quantity of land belonging to the United States, in consequence of having complied with the laws of Congress upon the subject of pre-emption. These laws have invariably required, that, in order to acquire this right, a person must have settled upon the land, or cultivated a portion of it, or have done both: so that a pre-emptor is one, who, by settlement upon the public land, or by cultivation of a portion of it, has obtained the right to purchase a portion of the land thus settled upon or cultivated, to the exclusion of all other persons; and, but for the words now under consideration, we should think that the sale or assignment of this right was alone prohibited. It was contended by the counsel for the plaintiff in error that this right was a mere personal privilege, and not in its nature assignable; and that it would be absurd to suppose Congress intended to prohibit the transfer of that which is not capable of transfer. But it is to be observed that such rights may be made assignable by the legislatures of the States and Territories in which the public lands are situated; and it may have been the intention of Congress to declare such assignment void, notwithstanding they were allowed by State or Territorial legislatures, and thus prevent the public domain from being occupied by persons who did not intend to purchase it and become permanent occupiers of the soil.

" But, whatever may have been the intention of Congress, we cannot give to the words 'right of pre-emption' alone such signification as would apply them to a subject-matter wholly foreign to their true meaning and intent.

" Do the words 'before the issuance of the patent,'

used in the statute, so enlarge and extend their mean-
ing as to compel us to give them this interpretation?
We are compelled to answer this question in the nega-
tive. We have given full effect to the principle, always
applied to the interpretation of a statute, which compels
courts so to construe it as to give to all parts of it some
force and effect; and also to the principle of interpreta-
tion, by force of which courts look at all the various
parts of the statute, and endeavor to make them all
harmonize. But we have been unable to give the
clause of the Act of Congress in question such a con-
struction as to allow it to extend the meaning of the
words 'right of pre-emption,' so as to prohibit a sale
of the land after all the rights of pre-emption have
been merged in the actual purchase of the land.

"It is to be observed that our statute (Revised Statutes,
chap. xcviii. sect. 95) provides that the receiver's receipt
(such as Crane received at the time he paid for the land)
shall be evidence of title in the person who pays the
money, and to whom the receipt is given.

"But it was contended by the counsel for the plaintiff
in error that the legal title to the public lands remains
in the United States until the patent issues, notwith-
standing the payment of the purchase-money and the
issuing of the certificate to the purchaser.

"It is not necessary to controvert this doctrine in order
to uphold the law of this State so far as it relates to
suitors in our own courts. We suppose the legislature
of this State can prescribe what shall be deemed evidence
of title to land as between the citizens of this State and
all who seek the aid of its judicial tribunals.

"But, whether this is so or not, it is plain that the rights
of a person as a pre-emptor cease when he has paid the
purchase-money and obtained his certificate. He no
longer has a right to purchase, because he has already

FRANKLIN *v.* KELLEY.

purchased and paid the purchase-money : it is therefore immaterial to inquire whether the legal title is in the United States till the patent issues or not, because the purchaser has an interest in the land entirely different from that of a pre-emptor, — one which can be sold, and which will pass by the ordinary forms of conveyance.

" We cannot suppose that Congress intended by the words ' previous to the issuance of the patent ' to prevent the sale of the land, or of the interest in land which the pre-emptor acquires by the payment of the purchase-money. Had this been intended, the prohibition would have been contained in language clear, plain, and adapted to the object to be accomplished."

The other case to which we refer is that of *Camp* v. *Smith*, 2 *Minn.*, 230 ; which is an elaborate and full discussion of all the principles involved. I do not think it necessary to set forth the opinion in that case at length. It is very strong and well reasoned in favor of the position taken by us. Many cases are referred to in support of the defendant's position ; but an examination of them will show, in almost every instance, that the deeds in question in them were made by the pre-emptor before his entry. Deeds so made are, upon the construction which we have placed upon the statute, void. The following are of this class : *Arbone* v. *Nettles*, 12 *La. An.*, 217 ; *Craig* v. *Tappan*, 2 *Sandf.* ; *Stanbourgh* v. *Wilson*, 13 *La. An.*, 494 ; *Winn* v. *Morris*, 16 *Ark.*, 414 ; *Randall* v. *Edhart*, 7 *Minn.*, 450 ; *Doe* v. *Hays.*

And the case here relied on by the defendant, of *Kellom* v. *Easley*, cited above, does not conflict with our view. In that case, Johnson, the pre-emptor, mortgaged the land to Easley, after his entry, but before his patent issued : his entry was set aside by the commissioner of the land department, and the lands sold at auction. Kellom was the purchaser at that sale ; and the attempt

was to enforce Easley's mortgage against Kellom's title. To support the pre-emptor's deed when his entry was vacated would be against the act as we have construed it. It is true, Judge Dillon in his decision goes beyond the case as presented; but all he says is *obiter* when applied to the circumstances of the one before us.

There are other considerations which support our views on this subject. The practical operation of the other construction shows that it could not have been within the purpose of Congress. We all know that the time when a patent will issue on any particular pre-emption-entry is very uncertain. On one entry it may issue in two months; on another, not for as many years; and this without any special merit or fault of either party. It is hardly conceivable that Congress meant to subject the rights of parties to such accidents.

There is another consideration. It is not competent for Congress to impose such a rule as the construction contended for would imply. This will appear from a very brief consideration of the nature of the proprietorship which the United States has in the public lands. It does not hold them as the sovereign, but merely in the same way that the citizen does. The eminent domain does not rest in the Federal Government, but in the States. Indeed, the States may take the public domain, as they may take private property, for roads and other internal improvements. The States could tax the public lands, if they had not, each one of them as it came into the Union, entered into a compact with the United States not to do so. These points have all of them been decided, and are settled law. *United States* v. *The Railroad Co.*, 6 *McLean*, 515; *The West River Bridge Co.* v. *Dix*, 6 *Howard*, 507. They prove that the public lands are subject to the State legislation, except that the State cannot interfere with the primary disposal of the soil,

FRANKLIN *v.* KELLEY.

having stipulated not to do so. Being thus subject to State legislation, it is competent for the legislature to say that a pre-emptor shall be estopped to deny the title which, acquired by his entry, he conveys before his entry ; and it is incompetent for Congress to deny that such shall be the effect of his deed. I state this as my own opinion, and do not mean to state it as the judgment of the Court.

We have a statute which makes even a quitclaim deed operate as an estoppel. The deed which we are here considering is with covenants of warranty and for title. If the provision of the Federal statute were to be construed as is claimed, I am of the opinion that it was not within the competency of Congress to enact it. I have already occupied so much time in explaining and justifying the views of the Court, that none remains for a full exposition of this point ; and I have felt compelled to set forth our opinions at great length, because they are in conflict with those held by all three of the learned judges of the United-States Circuit Court, — Mr. Justice Miller of the Supreme Court, Judge Dillon of the Circuit, and Judge Dundy of the District Courts. The vast importance to the whole Western country, and to our own State in particular, of this question, is a sufficient justification for our course.*

The ruling of the District Court was correct, and the evidence as to the issue of the patents rightly excluded.

The defendants offered on the trial to show that the deed to the plaintiff made by Margaret Kelley was obtained by fraud. Castetter, the officer before whom the acknowledgment was taken, was called by the defendants, and asked this question, — " State all the cir-

---

* The question determined in this judgment has, since its delivery, been finally decided by the Supreme Court of the United States. The opinion of that Court will be found in the Appendix to this volume.

FRANKLIN *v.* KELLEY.

cumstances attending the signing and acknowledging of the deed from Margaret Kelley to Warren B. Franklin, dated Jan. 6, 1866 : " and counsel stated, that, in order to prove the fraud charged against Franklin in procuring the deed, they would show that Margaret Kelley had very feeble mental capacity ; and, in obtaining the deed, the plaintiff took advantage thereof, and in this connection offered a deed from her to Timothy Kelley, one of the defendants, dated Jan. 13, 1866. The plaintiff objected ; and the Court declined to admit the testimony, or receive the deed ; and this ruling is assigned for error.

It will be observed that the offer of the defendants was very broad. It was not merely to show a case of a hard bargain made between two persons dealing at arm's-length, nor a case of two persons dealing together, — the one not so astute in making bargains as the other ; but it was the case of one party being of very feeble mental capacity, and of the other party taking advantage thereof to such an extent as to constitute fraud.

Again : it will be observed that the defence proposed to be shown was not made by a stranger to the fraud. It may well be, that if one party has been defrauded by another ever so grievously, and yet does not object, but submits to the injury, a third party cannot allege it ; but the case here is where such defrauded person has transferred the property of which he has been defrauded to another. These are matters which will be adverted to hereafter : they are mentioned here in order that all the facts of the case may be before us in the examination.

The principle that a claimant in a real action must recover on the strength of his own title is so firmly established, that little can be found in the reported cases respecting the evidence necessary on the part of the

FRANKLIN v. KELLEY.

defendant to avoid a deed produced by the plaintiff. On the trial of such action, the plaintiff must of course, in the first instance, show a clear and substantial title in himself. This being done, the defendant need do no more than falsify the proof thus made. He need not show that he has a valid claim to the premises, or give evidence of a title in a third person. It is sufficient if he make it appear to the satisfaction of the jury that a legal title does not subsist in the plaintiff by any course of testimony to that end. Thus, if the plaintiff claim as heir-at-law, the defendant may show a devise by the ancestor to a stranger, or that another, and not the claimant, is heir, or any other circumstance or state of facts which will invalidate his title. If he claims as devisee, the defendant may show that the will was obtained by fraud, or that it was not duly executed, or that the testator was a lunatic. On the same principle, the defendant may show that the plaintiff's title was void, whatever evidence of title had been shown. 2 Espinasse's Nisi Prius, 455.

The authorities in support of these positions are abundant.

*Crisp* v. *Barber*, 2 *Term*, 360, was where the lessor of the plaintiff claimed under a demise of the rectory-house, and from the rector for twenty-one years ; and the defendant had entered upon him without any color of title whatever. At the trial, the defendant relied on the lease being void under the statute of 13 Elizabeth, chap. xx., by reason of the non-residence of the rector, he having been absent more than eighty days within the year. This fact was proved. It was decided, that, as the words of the statute declared the lease void, the lessor of the plaintiff could not recover even from a defendant who was not in under color of title, and was a stranger and wrong-doer.

FRANKLIN v. KELLEY.

*Torrey* v. *Beardsly*, 4 *Wash. C. C.*, 242, was an eject-
ment tried before Mr. Justice Washington and a jury.
In his charge the learned judge stated " that the plain-
tiff's title was founded on two warrants for four hun-
dred acres each, dated in 1793, granted in the names
of Walter Kemble and Eliza Kemble.    The surveys
bear date in July, 1794, and are of different tracts of
land from those described in the warrants, to which they
were removed on account of the prior appropriation
of the tracts for which they called.    The surveys were
returned into the office, and accepted in January, 1797.

" On the 13th of August, 1796, deeds were executed
by Walter and Eliza Kemble to Jason Torrey, by which
they conveyed to him all their right and title to the
above warrants, and the lands surveyed or to be surveyed
under them, for the consideration of twenty pounds ;
being the amount of the original purchase-money paid
to the State for the warrants.    In March, 1802, an order
of resurvey was granted on the application of Jason
Torrey ; and the whole quantity not comprehended in
prior surveys was found to amount to three hundred and
seventy-two acres, for which a patent was granted to
Jason Torrey on the 1st of January, 1810, who, in Sep-
tember, 1818, conveyed the same to the lessor of the
plaintiff.

" The defendant claims the possession as tenant under
Walter Kemble, and disputes the plaintiff's title on
the ground of fraud in obtaining from him and Eliza
Kemble the conveyances stated.    Jason Torrey acted
as deputy-surveyor in the district where these surveys
were made ; and he is charged with having fraudulently
concealed from Walter Kemble the fact that the survey
of the land in dispute had been made at the time he
purchased the warrants from him, and with having
deceived him by the representation that there was no
vacant land on which to lay them.

Franklin *v.* Kelley.

"The Court has permitted the defendant to go into proof to establish the alleged fraud; and, if he has done so to your satisfaction, he is entitled to your verdict."

The learned judge then entered into a full and elaborate exposition of the proofs, and thereupon submitted the question of fraud to the jury. Although the verdict was for the plaintiff, that fact does not impair the authority of the case upon the point for which it is here cited; namely, that fraud may be shown in ejectment to defeat the plaintiff's title.

*Doe ex dem. The State Bank* v. *Moore,* 2 *Southard,* 470, was an ejectment upon a mortgage from the defendant to the bank. The defendant showed, in defence, that his son had seven notes discounted by the bank, on which were the names of the defendant and one Ryder; and the bond and mortgage were collateral thereto. Ryder denied his signature; and the son was arrested for forgery. A director of the bank, and the son, in the custody of the officer, went at midnight to the defendant's house, he being at the time very sick, and of infirm mind. The son requested to go in, in advance, and prepare his father for the business. This liberty was granted; and he went in, and, after some considerable time, returned, and told the others that he believed it would do now, — that his father would acknowledge the notes. They went in; and, being asked if he would acknowledge his signature, he said, "Yes;" and shortly afterwards the bond and mortgage were made. The fraud or imposition practised upon the defendant was the concealing from him the fact that the signature of Ryder was not genuine. In the course of his opinion, Southard, J., says, "In an action of ejectment, where the plaintiff claims title under a mortgage, is it proper for the defendant to prove that the bond and mortgage

were fraudulently obtained by deception and conceal-
ment, or were given to suppress a prosecution for forgery
already commenced? I think both these questions
may be very safely answered in the affirmative. What-
ever will avoid the bond and mortgage is a competent
defence in such a case; and that which shows a fraudu-
lent or illegal consideration will avoid them. A bond
fraudulently obtained, or given to suppress a prosecution
for a felony, never can be supported in a court of justice.
2 *Wils.*, 341–47; 1 *P. Wm.*, 156, 220."

*Jackson* v. *Myers*, 11 *Wend.*, 533, was ejectment brought
by the purchasers at an execution-sale, upon a judg-
ment against A. Parsons, docketed May 11, 1827.
Parsons was seized of the premises, but conveyed the
same to Miller Feb. 23, 1829, the deed being recorded
March 3 in the same year. The plaintiff, on the trial,
showed his title by judgment, execution-sale, and sher-
iff's deed; and the defendant showed his prior deed.
The plaintiff then assailed this deed by proof that it
was made to defraud creditors, and was therefore void.
The validity of the defence was not questioned, the
controversy arising on the competency of the testi-
mony.

*Doe ex dem. McCall* v. *Carpenter*, 18 *Howard*, 297,
was also an ejectment, on the trial of which the plain-
tiffs, in order to avoid a deed from their father to one
Stewart, offered to prove that it was obtained by fraud
on the part of Stewart; and also, that, at the time of its
execution, their father was of unsound mind, and inca-
pable of making a valid contract; that said unsoundness
was well known to Stewart, and that he took advan-
tage of it in obtaining the deed; that the consideration
of eleven thousand five hundred dollars mentioned was
never paid; that six thousand dollars in depreciated
State scrip was paid, or agreed to be paid; and that the

Franklin *v.* Kelley.

defendants purchased of Stewart with full knowledge of all the facts ; that the real estate purported to be conveyed at the time was worth twenty thousand dollars. To all which evidence the defendant objected; and the Court excluded the same. The Supreme Court held that this was error, and awarded a new trial.

These cases are sufficient to show that fraud may be shown in an ejectment to avoid a deed. And the offer made here was of matter which would, if proven to the satisfaction of the jury, have sustained the defence. The offer was not only of evidence showing mere imbecility of mind. When this alone exists, it will not avoid a deed, a contract, or any legal act. The law does not undertake to measure the validity of contracts by the greater or less strength of the understanding. Mere weakness of mental powers does not incapacitate a party from acting or contracting. But weakness of understanding may be a material circumstance in establishing an inference of unfair practice or of imposition. *Osmond* v. *Fitzroy*, 3 *P. Wm.*, 129; *Bennet* v. *Vade*, 2 *Atkins*, 324; *Blackford* v. *Christian*, 1 *Knapp's Appeals*, 73. Here the offer to show mental weakness in Margaret Kelley was only one element: it was accompanied by the offer to show that Franklin took advantage of it, and that he did so in such way, and to such extent, as constituted it fraud. It was proposed to show to the jury all the circumstances of the making of the deed, whereby they would be able to pass a fair and well-informed judgment upon the whole case.

And it is undoubtedly true that it is not every person who can avoid a deed for fraud. A stranger to the fraud cannot do so. It matters not how corruptly, as between A and B, the former secures an estate : if the latter does not object, no one else can or should. A fraudulently-acquired title is voidable only, and not

void; and it is voidable only by the injured party. He may affirm it, and it will be effectual. Of course this is not true of titles which are illegal: they are void absolutely, and not merely voidable; they cannot be affirmed. But all this was completely covered by the offer. The proposition was to show that Margaret had conveyed to these defendants. By so doing, she disaffirmed her deed to Franklin; and the defendants stood in her shoes as to that deed: they were not strangers to the fraud.

In whatever aspect the offer of the defendants is regarded, it is within the rule that fraud may be shown in ejectment to avoid a deed; and the refusal of the Court to hear the evidence was error. One other matter only remains to be noticed. It is insisted that this matter should have been specially pleaded. It is undoubtedly true, that the theory of the system of pleading under the Code generally is, that the facts necessary to constitute a cause of action or defence shall be stated. But, in respect of actions for the recovery of real property, another rule has been adopted. Why this is so is not very clear. It may be because, as two trials, of course, are given in that class of actions, the parties are supposed to learn, from what is shown on the first, what will be in issue on the final trial. But, whatever the reason, it is apparent that in this class of actions, as also in cases of replevin, the facts need not be stated. That being the rule of pleading contained in the Code, we have only to enforce it here.

The judgment of the District Court must be reversed, and a new trial awarded.

Reversed, and new trial awarded.